UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



FILED
AUG 12 2014

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | \* | CR. 14-40007 |
| Plaintiff | \* | |
| vs. | \* | REPORT and RECOMMENDATION |
| JASON DUENAS-ORTIZ, | \* | |
| Defendant | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending is Defendant's Motion to Suppress Evidence and Statements (Doc. 25). A hearing was held on Tuesday, July 22, 2014. Defendant was personally present and represented by his attorney of record, Assistant Federal Public Defender Jason Tupman. The Government was represented by Assistant United States Attorney Connie Larson. Three witnesses testified at the hearing. Two exhibits were received into evidence. Both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## RECOMMENDATION

It is respectfully recommended that Defendant's Motion to Suppress be GRANTED in part and DENIED in part.

## JURISDICTION

Defendant is charged in an Indictment with Illegal Reentry after Deportation in violation of 8 U.S.C. §§ 1326(a) and (b). The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Schreier's Standing Order dated March 18, 2010.

## FACTUAL BACKGROUND

Three witnesses testified at trial. Their testimony is summarized below:

### Yankton County Chief Deputy Sheriff Mike Rothschadl

Deputy Rothschadl has been a law enforcement officer for twenty-four years and has been with Yankton County since 2011. He supervises the other Yankton County deputies. He was on duty on December 16, 2013 when he made contact with the defendant, Mr. Duenas.[1] His office received a weekly BOLO[2] from the Fusion Center.[3] The BOLO indicated Duenas was expected to be at a particular Yankton address, and that he would be traveling with another individual (Linda Smith) so the sheriff's office had been keeping an eye on the house for signs that Duenas might be there.

Rothschadl identified EX 1 as a copy of the BOLO he received.[4] It was dated December 4, 2013. He had been driving past the residence indicated in the BOLO and, on December 16, he and Deputy Klimisch observed a vehicle registered to Linda Smith sitting in front of the residence.

The residence was a trailer house with a small porch leading to the front door. The front door had a window in it. Rothschadl approached the residence and looked through the window on the front door. Through that window they saw Duenas, who appeared to be the person depicted in the

---

[1] On the date of his encounter with Duenas, Rothschadl and the deputy who accompanied him (Klimisch) both wore plain clothes, a badge and a gun. The entire encounter was civil. No voices were raised. Rothschadl did not believe Duenas was intoxicated. No misrepresentations were made to Mr. Duenas.

[2] Be on the Lookout.

[3] "Fusion Centers were developed to promote information sharing between the federal government and state, local, tribal and private sector partners. Fusion Centers use intelligence information from law enforcement, public safety, fire service, emergency response, public health, critical infrastructure protection, and private sector security personnel to prevent, protect against, and respond to crime and terrorism. . . ."
https://dps.sd.gov/homeland_security/fusion_center.aspx

[4] The BOLO further indicated not only that the suspect (Duenas) might be at the Yankton address, but also that he had illegally re-entered the country after previously being deported. The BOLO contained a photo of Duenas and his date of birth, along with a photo of the woman (Smith) suspected of transporting Duenas into the country and a description and license plate number of the vehicle the authorities believed Smith would be driving. See EX 1.

BOLO, asleep on the couch in the living room. Deputy Rothschadl knocked on the front door. Duenas answered. Rothschadl identified himself and Deputy Klimisch then asked Duenas for identification. To retrieve his wallet, Duenas turned and walked to a coffee table next to the couch upon which he'd been sleeping. The door was left open. Without any verbal communication, the officers followed Duenas into the house. They asked Duenas to sit on the couch. Rothschadl explained they followed Duenas in for safety reasons. They never let someone walk into a house unaccompanied because the person might come back out with a gun.

The identification Duenas provided to the officers was an expired Mexican ID that did not match the name on the BOLO. Duenas initially denied his true identity, but when Rothschadl confronted Duenas with the BOLO he admitted his identity within a few moments.[5] When asked if he immediately knew Duenas was the person in the BOLO, Rothschadl said, "well, looking at the picture, I knew it was him, but I'm going to clarify it before I take somebody into custody." At no time did Deputy Rothschadl inform Duenas of the *Miranda* rights, or that he was free to leave or did not have to answer questions.[6]

One of officers walked through the trailer to determine whether any other people were present. Deputy Rothschadl testified the purpose of the walk-through was for officer safety. They walked through even though there was no indication anybody else was present. When Rothschadl asked Duenas where the other people were, Duenas indicated they were at work. The officers did not pat Mr. Duenas down to check for weapons. Duenas never gave any indication that he was a danger to the officers. They also looked through the trailer for mail to determine the names of the

---

[5]The conversation between the officers and Duenas was in English. Rothschadl testified that Duenas was able to communicate without any problem in English and that he was very civil and cooperative. Duenas candidly admitted during the evidentiary hearing that he speaks English although his first and preferred language is Spanish.

[6]Rothschadl could not remember how he phrased his request to see Duenas's identification (whether it was "may I see it" or " I need to see it") but he insisted the entire conversation was "polite."

3

people who lived there.[7] Neither Rothschadl nor the other deputy sheriff was asked during the hearing, nor did either one indicate whether they found any mail which helped them determine Duenas's identity. They did not ask Duenas for consent to search. Rothschadl indicated there was some mail on the kitchen counter in open view but they nevertheless opened some of the kitchen cabinets.

After Duenas admitted he was the person depicted in the BOLO, Rothschadl contacted another officer to transport Duenas to the sheriff's office. The other officer arrived in about five minutes. A city police detective (Bass) also arrived on the scene. The city officer contacted Agent Aramayo but did not participate in questioning Duenas and did not spend much, if any time inside the trailer. Rothschadl did not arrest Duenas but detained him on the BOLO.

### Yankton County Deputy Sheriff Dennis Klimisch

Dennis Klimisch has been a Yankton County Deputy Sheriff for eight years. He was on duty on December 16, 2013. His boss received a BOLO about a person who might be at a certain address in Yankton, so they had been watching for any signs that the person might be there. When they observed a vehicle at the residence, they approached the home and looked through a window on the front door. They saw a person lying on the couch inside. The person looked like the person depicted on the BOLO, so they knocked on the door.

The man who had been lying on the couch answered the door. He looked very similar to the person on the BOLO. He could not tell for sure whether it was the same person, but he looked "very, very similar." Deputies Rothschadl and Klimisch identified themselves and asked Duenas for identification. Duenas turned around and walked into the house. The officers followed him. The door remained open. Duenas went to the coffee table to retrieve identification. He offered Deputy Rothschadl an expired Mexican identification card that belonged to someone else. After that, Rothschadl showed Duenas the BOLO and asked Duenas if he was the person depicted. Duenas

---

[7]Rothschadl testified they did not remove anything from the trailer other than Duenas and the identification card he initially retrieved from his wallet.

4

admitted he was the person on the BOLO. There never appeared to be any communication problems between Rothschadl and Duenas.

Klimisch does not recall that he went through the house, but he knows one of the officers made sure nobody else was in the home. Klimisch believed they looked through the house for other people for officer safety reasons. Duenas, however, was very cooperative throughout the encounter. Any situation or person can be dangerous but there was nothing in particular about this person or this home that presented a heightened concern. Rothschadl looked at some items in plain view to discern who was living in the home. None of the items, however, were removed from the home.

### Department of Homeland Security Special Agent Charla Aramayo

Special Agent Aramayo was involved in the investigation of Mr. Duenas. In early December, she received an anonymous tip that Duenas had been previously deported and was traveling from the Mexican border to a particular residence in Yankton, South Dakota with a woman named Linda Smith and another woman who was the mother of his child. After Aramayo received the anonymous tip, she did some research and gathered information about Duenas. She gathered photos of Duenas and Smith and asked the Fusion Center to distribute a BOLO statewide.

When Aramayo initially received the tip, she had only Duenas's name. She researched his criminal history and discovered he had been previously arrested in Yankton. She found his date of birth and also found his alien ("A") file, which showed he had previous immigration arrests. Duenas had been deported either two or three times. Aramayo identified a warrant of removal from Duenas's "A" file. Typically if a person re-enters after an Order and Warrant of removal, the same Warrant is reinstated and used to remove them again if they re-enter.[8] In other words, the person does not receive another civil removal process. All of the information she gathered led her to believe that if Duenas was in fact in the United States, he had illegally re-entered the United States after deportation.

---

[8]Aramayo admitted none of this information about the pre-existing Order and Warrant of removal was probably known to the local Yankton officers who encountered Duenas on December 16, 2013.

5

On December 16, 2013, Aramayo received a call from Detective Bass with the Yankton Police Department. She then spoke with Deputy Rothschadl about the procedure he'd followed and whether any local charges would be brought against Duenas. Rothschadl agreed to detain Duenas overnight. Aramayo filed an immigration detainer. Aramayo understood Rothschadl was going to charge Duenas with possession of a false identification document and that the local authorities would hold him overnight on that charge. The Yankton County Sheriff's office faxed or emailed Duenas's fingerprints to Aramayo. She compared the prints to the prints in Duenas's "A" file–they were a match. Aramayo drove to Yankton the next day to retrieve Duenas. She idented[9] Duenas which revealed he was the same person who had previously been deported pursuant to the earlier Warrant.

## DISCUSSION

### Burden of Proof

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. *United States v. Phillips*, 540 F.2d 319 (8th Cir.1976). The Government, however, bears the burden of proving by a preponderance of the evidence that Miranda warnings were either not necessary or that they were given and effectively waived. *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966); *United States v. Short*, 790 F.2d 464, 467-68 (6th Cir. 1986); *United States v. Charbonneau*, 979 F.Supp. 1177, 1181 (S.D. Ohio 1997). The parties agree the officers did not read Duenas his Miranda rights before he admitted he was the person depicted in the BOLO. The issue in this case, therefore, is whether Duenas was illegally seized and whether the lack of Miranda warnings renders Duenas's statements, ultimate arrest and all information which followed illegal and therefore inadmissible.

### 1. The Officers Did Not Unlawfully Seize Duenas When they Knocked on The Door of The Trailer and Asked Duenas About the BOLO

Initially, Duenas asserts the officers' entry into the trailer where he had been asleep on the couch constituted an unlawful seizure in violation of the Fourth Amendment. When the officers saw the vehicle registered to Linda Smith in the yard of trailer home which was the subject of the

---

[9]Ident is an electronic fingerprinting process.

BOLO, they decided to investigate further. They approached the trailer, looked through the window on the door, and saw Duenas asleep on the couch. They decided to knock on the door to talk with Duenas and gather further information to confirm or dispel their suspicion it was in fact Duenas who they saw through the window. If Duenas had been on the street, the officers could have conducted a *Terry* stop.[10]

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be the most reasonable in light of the facts known to the officer at the time.

*United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). Because Duenas was inside the trailer, they knocked on his door instead of conducting a *Terry* stop on on the street. This method of information gathering is known as a knock-and-talk. "It does not violate the Fourth Amendment merely to knock on the door without probable cause." *United States v. Spotted Elk,* 548 F.3d 641, 655 (8th Cir. 2008) (citation omitted). A police officer need not be armed with warrant to approach a home and knock on the front door, "precisely because that is no more than any private citizen may do." *Florida v. Jardines*, 133 S.Ct. 1409, 1416, 185 L.Ed. 495 (2013) (citations omitted). The knock-and-talk and its relationship to Fourth Amendment principles are aptly explained in *United States v. Ponce Munoz*, 150 F.Supp.2d 1125 (D. Kansas):

> Absent express orders from the person in possession against any possible trespass, there is no rule of public or private conduct which makes it illegal per se, or a condemned invasion of the person's right to privacy, for anyone openly and peacefully, at high noon, to walk up the front steps and knock on the front door of a man's 'castle' with the honest intent for asking questions of the occupant thereof–whether the questioner be a pollster, a salesman, or an officer of the law.

*Id.* at 1132 (citations omitted). The Court noted that a knock-and-talk is "ordinarily consensual unless coercive circumstances such as unreasonable persistence by the officers turns the encounter into an investigatory stop. The Court recognizes that other factors, such as the display of weapons, physical intimidation or threats by the police, multiple police officers questioning the individual, or

---

[10] *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

unusual place or time for questioning may transform a consensual encounter between a citizen and a police officer into a seizure." Id. at 1133. No such coercive circumstances were present here. The officers were not unusually persistent. Rothschadl and Klimisch both testified that although he initially presented a false identification card, upon being shown the BOLO Duenas immediately acknowledged his identity. Although the officers did not inform Duenas he was not required to answer questions or allow them in, Duenas answered their questions immediately, and offered no protest nor did he ask them to leave.

> What is apparent . . .is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave had he not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment.

*INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762-63, 80 L.Ed.2d 247 (1984). The reasonable person test presupposes an innocent person. *United States v. Flores-Sandoval,* 474 F.3d 1142, 1145 (8th Cir. 2007) (citations omitted) (*Flores-Sandoval–II*).

The officers had weapons on their services belts, but the weapons were not un-holstered or otherwise used in a display of force. A city policeman arrived on the scene (un-invited by the two deputy sheriffs who conducted the knock-and-talk), but he did not enter the trailer or participate in questioning Duenas. The knock-and-talk occurred just before noon at Duenas's residence – not an "unusual place or time." The encounter was extremely brief. Duenas was not unlawfully seized, therefore, during this classic, consensual knock-and- talk investigation.

### 2. The Officers Did Not Violate Duenas's Fifth Amendment Rights When they Asked him Identity Questions Without Advising Him of His *Miranda* Rights

Duenas next asserts his non-Mirandized admission to Rothschadl and Klimisch that he was the person depicted in the BOLO must be suppressed because it was a custodial statement. "Police officers are not required to administer *Miranda* warnings to everyone whom they question. The protections of *Miranda* apply to custodial interrogations." *United States v. Flores-Sandoval,* 474 F.3d 1142, 1146 (8th Cir. 2007) (citations omitted) (*Flores-Sandoval–II*). An interrogation is

8

custodial only if the person "has been taken into custody or otherwise deprived of his freedom in any significant way. . . The ultimate inquiry is whether there was a formal arrest, or restraint on freedom of movement of the degree associated with formal arrest." *Id.* The custody determination is based on the objective circumstances, not the subjective views of either the defendant or the officers. *Id.*

To determine whether Duenas was in custody when he admitted he was the person depicted in the BOLO the Court considers the totality of the circumstances confronting Duenas and then considers whether a person in his position would consider his freedom of movement "restricted to the degree associated with formal arrest." *Id.* (citation omitted). For many years, the Eighth Circuit relied on the various indicia of custody defined in *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990). They are: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning. In *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004), however, the Eighth Circuit cautioned the *Griffin* factors are by no means exhaustive and should not be applied "ritualistically." "Rather than demarcate a limited set of relevant circumstances, we have required police officers and courts to examine all of the circumstances surrounding the interrogation. . . .Custody cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *United States v. Lowen*, 647 F.3d 863, 867 (8th Cir. 2011) (citations omitted).

Neither Rothschadl nor Klimisch specifically informed Duenas that he was not under arrest, that he did not have to answer their questions or that he could ask them to leave. The officers asked Duenas to sit on the couch (the same couch on which he'd been lying before they arrived) while they conversed with him, but there is no indication that his freedom of movement was restrained during the brief encounter. The officers initiated the contact, but Duenas acquiesced to their request for

9

information and did not ask them to leave. There is no evidence of strong arm tactics or deceptive stratagems. Although there were multiple officers present (two initially, with two others arriving after Duenas made his incriminating statement) there was no show of force or use of weapons. Duenas was taken into custody at the conclusion of the encounter. Given the totality of the circumstances, I find that Duenas was not in custody during this very brief encounter before he admitted he was the person in the BOLO.[11] That the officers did not explicitly inform Duenas he was not under arrest is not dispositive "as the touchstone of [the] inquiry remains whether [the suspect] was restrained as though he were under formal arrest." *United States v. Lowen*, 647 F.3d at 868. In Lowen, as here, "when a suspect is interrogated in the comfort and familiarity of his own home, a court is less likely to find the circumstances custodial." *Id.* Duenas was not in custody when he admitted he was the person depicted in the BOLO.

### 3. The Officers Did Not Violate Duenas's Fourth Amendment Rights When they Arrested Him Without an Arrest Warrant

The docket in this case shows that Agent Aramayo filed a Complaint in this case on December 17, 2013 and that a federal warrant was issued on that same date. Aramayo's supporting affidavit indicates her belief that Rothschadl detained Duenas on state charges on December 16. Rothschadl, however testified he detained Duenas on the BOLO. In other words, Rothschadl

---

[11]In the event a reviewing court believes that Duenas's admission he was the person depicted in the BOLO was a custodial statement which required *Miranda* warnings, Duenas's fingerprint evidence should nevertheless be admissible because Rothschadl had probable cause to arrest Duenas the moment Rothschadl recognized him as the person in the BOLO when the trailer door opened, even in the absence of Duenas's non-*Mirandized* statement. Recall Rothschadl's testimony that he "knew" the man who opened the door was Duenas even before the question was asked.

> It is no surprise that the body or identity of a defendant . . . in a criminal or civil proceeding is never itself suppressible as fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search or interrogation occurred. However, identity evidence specifically fingerprints, taken as fruit of a Fourth Amendment violation should be suppressed.

*United States v. Perez-Perez*, 337 F.3d 990, 994 (8th Cir. 2003). Even if there was a Fifth Amendment violation, there was no illegal detention in this case.

10

detained Duenas pursuant to his belief that Duenas would be charged on the federal charge of illegal re-entry after deportation (the crime described in the BOLO). Pursuant to Fed. R. Crim. P. 5, Duenas was transported to Sioux Falls and his probable cause hearing was held on December 17, 2013. *See* Docket entries 2 and 5. It is undisputed, however, that at the time Rothschadl took Duenas into custody, the federal warrant had not yet been issued. In reality then, he was arrested without a warrant.

Local authorities may assist federal authorities in detaining individuals suspected of being unlawfully present in the United States. *United States v. Ovando-Garzo*, 752 F.3d 1161, 1164 (8th Cir. 2014). The agreement to assist federal authorities need not been in writing. *Id.* 8 U.S.C. § 1357(g)(10). In general,

> Police officers have probable cause to make an arrest if the facts and circumstances within the law enforcement officer's knowledge...are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. Probable cause exists to make a warrantless arrest when, at the moment of the arrest, the collective knowledge of the officers involved was sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense.
>
> The determination of probable cause does not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of the circumstances. While a bare suspicion of criminal activity is not sufficient to establish probable cause, neither are police required to have enough evidence to justify a conviction before they make a warrantless arrest.

*United States v. Morales*, 923 F.2d 621, 623-24 (8th Cir. 1991). In this case, based on the information contained in the BOLO, Duenas's resemblance to the photo on the BOLO, and finally Duenas's admission that he was in fact the person depicted, the facts within Rothschadl's knowledge were sufficient to lead a reasonable person to believe that Duenas was committing the federal felony of being present in the United States after having been previously deported in violation of 8 U.S.C. § 1326.

The Immigration statutes and regulations likewise specifically provide for warrantless arrests based on criminal violation of immigration laws. *See United States v. Quintana*, 623 F.3d 1237, 1240 (8th Cir. 2010). 8 U.S.C. § 1357(a) provides in relevant part:

11

**§1357 Powers of immigration officers and employees**
**(a) Powers without warrant**
Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have the power without warrant–
(1) to interrogate any alien or person believed to be an alien as to his right to remain in the United States;
(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;
\*\*\*
(4) to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit person charged with offenses against the laws of the United States;

\*\*\*

"The Attorney General's regulations implementing 8 U.S.C. § 1357(a) carefully distinguish between warrantless arrests for the purpose of commencing civil deportation proceedings, and warrantless arrests for criminal violations of the immigration laws." *Quintana*, 623 F.3d at 1240. The Code of Federal Regulations sets out the requirements for warrantless arrests involving criminal violations of the immigration laws:

**8 CFR § 287.8 Standards for enforcement activities**

(c) Conduct of arrests
    (2) General procedures.
    (i) An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested is an alien illegally in the United States.
    (ii) A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained.[12]
    \*\*\*

---

[12] Although no testimony on this issue was received during the evidentiary hearing, it is reasonable to assume that after Duenas admitted he was the person depicted on the BOLO, Rothschadl was justified in arresting Duenas without a warrant pursuant to this exception.

> (iv) with respect to a person arrested and administratively charged with being in the United States in violation of law, the arresting officer shall adhere to the procedures set forth in 8 CFR 287.3 if the arrest is made without a warrant.
> (v) with respect to a person arrested and charged with a criminal violation of the laws of the United States, the arresting officer shall advise the person of the appropriate rights as required by law at the time of the arrest, or as soon thereafter as practicable. It is the duty of the immigration officer to assure that the warnings are given in a language the subject understands, and that the subject acknowledges that the warnings are understood. The fact that a person has been advised of his or her rights shall be documented on appropriate Department forms and made a part of the arrest record.[13]
> (vi) every person arrested and charged with a criminal violation of the laws of the United States shall be brought without unnecessary delay before a United States Magistrate Judge [or other appropriate judicial officer]. Accordingly, the immigration officer shall contact an Assistant United States Attorney to arrange for an initial appearance.
> (vii) The use of threats, coercion, or physical abuse by the designated immigration officer to induce a suspect to waive his or her rights or
> to make a statement is prohibited.

Deputy Sheriff Rothschadl detained Duenas without a warrant because there was probable cause to believe Duenas was in the United States in violation of 8 U.S.C. § 1326. Once Duenas admitted he was the person depicted in the BOLO, it was reasonable to believe he would abscond before a warrant could be obtained. The requirements of 8 U.S.C. § 1357(a) and 8 CFR § 287.8 (c)(2)(ii), therefore, were met and no warrant was required. Agent Aramayo obtained a federal warrant the next day and transported Duenas to Sioux Falls where he properly received his initial appearance pursuant to Fed. R. Crim. P. 5 and 8 CFR § 287.8 (c)(2)(vi). Duenas was, therefore, properly arrested without a warrant on December 16, 2013.

### 3. The Fourth Amendment Search Issue Is Moot

Finally, Rothschadl and Klimisch testified they swept or searched the trailer for (1) other people and (2) mail. They testified they performed a protective sweep for safety purposes and they

---

[13]There was no evidence about when Duenas received the *Miranda* warnings or whether he made any statements after Rothschadl and Klimisch called for the third officer to transport Duenas after they decided to take him into custody. As of the moment Rothschadl called for the third officer, however, Duenas was in custody and any statements he made after that time in the absence of *Miranda* should be inadmissible.

13

looked for mail to determine who lived in the trailer. They found no other people. It is unclear whether their search for mail revealed any useful information, but no mail was removed from the trailer.

In *Maryland v. Buie*, 494 U.S. 325, 3327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) the United States Supreme Court established a two-pronged test for determining whether a protective sweep incident to arrest is constitutionally permissible. First, "as incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be launched." *Id.*, 494 U.S. at 334, 110 S.Ct. at 1093. A broader sweep is allowed "when the searching officer possesses a reasonable belief based on specific and articulable facts that the area swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337, 110 S.Ct. at 1093. "In either circumstance, a protective sweep is not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than necessary to dispel the reasonable suspicion of danger . . ." *Id.* at 335-36, 110 S.Ct. at 1093. Neither officer in this case articulated specific facts which indicated they had any reason to believe the trailer in which they found Duenas harbored any other people who posed a danger. The "broader sweep" of the trailer was not permissible.

Likewise, "when the government enters a defendant's home without a warrant, we presume that the search was unreasonable and therefore in violation of the Fourth Amendment. This presumption is rebuttable in certain situations, however. One such situation exists when the government demonstrates that exigent circumstances make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *United States v. Valencia*, 499 F.3d 813, 815 (8th Cir. 2007) (citations omitted, punctuation altered). The officers' warrantless, trailer-wide search for mail was unreasonable and not supported by exigency or any other exception to the warrant requirement.

There is no indication, however, that the impermissible "protective sweep" or warrantless search for mail produced any evidence or information. No other people were found in the trailer,

14

and Rothschadl testified the officers did not remove anything from the trailer other than Duenas and the card he produced from his wallet when he was initially asked for identification at the beginning of the encounter. "A constitutional violation does not call for suppression of physical evidence or statements when the violation does not cause the discovery of evidence or the utterance of the statements." *United States v. Spotted Elk*, 548 F.3d 641, 655-56 (8th Cir. 2008). Because neither the protective sweep nor the warrantless search caused the discovery of evidence the Fourth Amendment search issue should be DENIED as moot. Should it later be determined, however, that any physical evidence was discovered as a result of the protective sweep or the warrantless search of the trailer, said evidence should be suppressed.

## CONCLUSION

For the reasons more fully explained above, it is respectfully RECOMMENDED to the District Court that Defendant's Motion to Suppress (Doc. 25) be GRANTED in part and DENIED in part as follows: the Defendant was in custody as of the moment Rothschadl called for the third officer to transport the Defendant to the Sheriff's office. Any statements made by the Defendant after that time, in the absence of *Miranda* warnings, should be inadmissible. The balance of the Motion should be DENIED.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

Dated this 12 day of August, 2014

BY THE COURT:

John E. Simko
United States Magistrate Judge

15