UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JASON DUENAS-ORTIZ,<br><br>Defendant. | CR. 14-40007-01-KES<br><br>ORDER ON OBEJCTIONS TO REPORT AND RECOMMENDATION GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS |

**NATURE AND PROCEDURE OF CASE**

Defendant, Jason Duenas-Ortiz, is charged with illegal reentry after deportation in violation of 8 U.S.C. §§ 1326(a) and (b). Duenas-Ortiz has moved to suppress all physical evidence, statements, and evidence of his identity as fruit of an unlawful entry and unlawful interrogation in violation of his Fourth and Fifth Amendment rights. Docket 25. The motion was referred to a United States magistrate judge for a report and recommendation.

An evidentiary hearing was held on July 22, 2014. During the hearing, testimony from three law enforcement agents was presented, and two exhibits were received into evidence. Subsequently, the magistrate judge issued a report and recommended the granting of Duenas-Ortiz's motion to suppress with respect to any statements made after law enforcement had called for another officer to book Duenas-Ortiz, but denying the remainder of the motion. Docket 34. Duenas-Ortiz objected to portions of the report and recommendation. Docket 41. For the following reasons, the court adopts in part and rejects in

part the report and recommendation, grants the motion to suppress Duenas-Ortiz's statements to law enforcement, and denies the motion to suppress based on Fourth Amendment violations and the motion to suppress Duenas-Ortiz's fingerprints.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(C), the court should make a de novo review "of those portions of the [magistrate judge's] report or specified proposed findings or recommendations to which objection is made." *Accord United States v. Benitez*, 244 F. App'x 64, 66 (8th Cir. 2007) ("If a party objects to the magistrate judge's report and recommendation with respect to a dispositive matter, the district court judge must conduct a *de novo* review of the disputed portion of the magistrate judge's report and recommendation."). Motions to suppress evidence are dispositive motions that require de novo review. Fed. R. Crim. P. 59(b)(1), (3). De novo review in the context of reviewing a magistrate judge's report and recommendation does not require a new evidentiary hearing and only means a district court "give[s] fresh consideration to those issues to which specific objection has been made by a party." *United States v. Raddatz*, 447 U.S. 667, 674-75 (1980) (internal quotations and citations omitted). The court has conducted a de novo review.

## FACTS

The pertinent facts are as follows:

On December 4, 2014, Yankton County law enforcement officials received a "Be on the Lookout" notice, or BOLO, from the Department of Homeland Security. The BOLO advised law enforcement that Homeland Security had received a tip that Duenas-Ortiz, having been previously deported, had illegally reentered the United States and was likely traveling to Yankton, South Dakota. The BOLO further indicated that a woman named Linda Judith Smith was transporting Duenas-Ortiz, and that Duenas-Ortiz would likely return to the residence of Maria Salinas, with whom Duenas-Ortiz had a child. The BOLO provided a description and the license plate number of Smith's vehicle and the address of Salinas's home.

After receiving the BOLO, Yankton local law enforcement regularly checked Salinas's residence for any sign of the vehicle described in the BOLO or Duenas-Ortiz himself. On December 16, 2013, Yankton County Chief Deputy Sheriff Mike Rothschadl and Yankton County Deputy Sheriff Dennis Klimisch observed a vehicle that was registered to Smith at Salinas's residence.[1] Rothschadl and Klimisch approached the residence and looked in through either a window next to the door or a window on the door itself. They observed a man sleeping on a couch in the living room who appeared to be the man in the BOLO. The deputies knocked on the door and the man, Duenas-

---

[1] The vehicle was not the Jeep Liberty mentioned in the BOLO, but was another vehicle registered to Smith.

Ortiz, answered. Both Rothschadl and Klimisch testified that they were in plain clothes but wore their badges and guns and identified themselves as law enforcement officers.

Upon making contact with Duenas-Ortiz, Rothschadl instructed Duenas-Ortiz to provide his identification.[2] Duenas-Ortiz turned and walked a short distance to a coffee table, which was next to the couch on which he had been sleeping, and retrieved his wallet. Duenas-Ortiz left the door open behind him. Both deputies testified that Duenas-Ortiz did not invite them in, but they simply followed him in through the open door. The deputies also testified that they entered the residence out of a concern for officer safety. The deputies did not have a search warrant or an arrest warrant.

Duenas-Ortiz handed the deputies an expired Mexican identification that did not match the person in the BOLO. Rothschadl testified as follows:

> I checked his ID and saw that it was expired and the name didn't match the BOLO. I didn't believe him at this point because the picture looked just like him. So we were looking through some mail. After a few minutes of him denying who he was, I just showed him the BOLO, and he admitted that he was Jason Ortiz.

Tr. 9:21-10:1.[3] Rothschadl testified that after Duenas-Ortiz provided the fake identification, he asked Duenas-Ortiz to sit on the couch while Rothschadl remained standing and questioned him. Following the deputies' initial entry

---

[2] The forcefulness of Rothschadl's phrasing, and therefore whether it was a request or a command, is one of the factual disputes in this case and will be addressed in detail later.

[3] All citations to "Tr." refer to the transcript of the motion hearing found at Docket 32.

into the house, Klimisch performed a protective sweep of the trailer.[4] At least one officer searched through mail on the kitchen counter and in various kitchen cabinets. Eventually, another deputy arrived to transport Duenas-Ortiz to the sheriff's office, and a detective with the city of Yankton's police department also arrived and contacted Agent Charla Aramayo, a special agent with the Department of Homeland Security. Both deputies testified that the encounter was civil, Duenas-Ortiz was cooperative, and the conversations took place in English. Duenas-Ortiz did not appear to have difficulty understanding the deputies.[5] Law enforcement never performed a pat-down of Duenas-Ortiz, and no officer advised Duenas-Ortiz of his *Miranda* rights.

After Duenas-Ortiz admitted he was the person in the BOLO, he was detained and fingerprinted by the Yankton County Sheriff's Office. Those fingerprints were sent to Agent Aramayo. The next day, Agent Aramayo picked Duenas-Ortiz up and brought him to the Department of Homeland Security office where agents electronically fingerprinted him, which confirmed that Duenas-Ortiz was the same person who had been previously deported.

---

[4] Klimisch stated that he did not remember if he personally searched the residence, but confirmed that a law enforcement officer did so. Rothschadl testified that Klimisch performed the sweep.

[5] Duenas-Ortiz stated at the motion hearing that he speaks English but his preferred language is Spanish.

# DISCUSSION

## I.   Factual Objections

### A.   Objection 1

Duenas-Ortiz objects to the report and recommendation's finding that
Rothschadl "asked Duenas for identification." Docket 34 at 3 (finding in the
report and recommendation); Docket 41 at 5 (objection). Instead, Duenas-Ortiz
characterizes Rothschadl's statement as a command that he produce
identification. Rothschadl testified that he could not remember whether he had
phrased his statement to Duenas-Ortiz as a request or a command. Tr. 15:8-
14. In his report, Rothschadl wrote that he told Duenas-Ortiz that he "need[ed]
to see" his identification rather that asking "may I see your ID [?]" *See* Tr. 15:8-
21. That language could be interpreted as a command, but it could also be
interpreted as a request depending on such variables as the officer's tone or
body language. Therefore, the phrasing noted in the report does not resolve the
issue raised by Duenas-Ortiz's objection. Both deputies testified that their
interactions with Duenas-Ortiz were civil and polite, and that Duenas-Ortiz
was cooperative throughout. Tr. 15:13-14; Tr. 35:11-13. There is no other
evidence that Duenas-Ortiz understood Rothschadl's statement as a command
instead of a request. Based on the evidence in the record, Objection 1 is
overruled.

### B.   Objection 2

Duenas-Ortiz objects to the report and recommendation's finding that
law enforcement "asked Duenas to sit on the couch." Docket 34 at 3 (finding in

the report and recommendation); Docket 41 at 6 (objection). Duenas-Ortiz's objection revolves around whether law enforcement requested that he sit on the couch or whether law enforcement instructed him to sit in a coercive manner.

As with Objection 1, the tone and manner of Rothschadl's statement are important to any distinction between a request and a command. There is no mention of Rothschadl's phrasing in the evidence presented at the suppression hearing. Again, both deputies testified that the entire interaction was polite and civil. Rothschadl further testified as follows:

> Q: And you had him sit down on the couch, that wasn't something he voluntarily did?
>
> A: I mean – like with anybody that we encounter if we're going to talk to them in their house, they're going to sit down and we're going to talk to him.
>
> Q: Right, but that was at your direction?
>
> A: Correct.
>
> Q: And he wasn't free to leave then, was he?
>
> A: He wasn't after he identified himself as being who he was, no.

Tr. 23:24-24:9. The evidence tends to support the conclusion that when Rothschadl instructed Duenas-Ortiz to sit on the couch, it was more likely than not a command. Therefore, Objection 2 is sustained.[6]

---

[6] This limited factual objection is not determinative of whether Duenas-Ortiz was in custody for *Miranda* purposes when Rothschadl questioned him. Whether a person is in custody is determined by the totality of the circumstances, not solely on whether that person was politely asked, or commanded, to sit at the beginning of the interview. *See United States v. Holleman*, 743 F.3d 1152, 1159 (8th Cir. 2014) (totality of the circumstances).

### C.    Objection 3

Duenas-Ortiz objects to the report and recommendation's finding that the deputies followed Duenas-Ortiz into the house for safety reasons. Docket 34 at 3 (finding in the report and recommendation); Docket 41 at 6-7 (objection). The report and recommendation states, "Rothschadl explained they followed Duenas in for safety reasons. They never let someone walk into a house unaccompanied because the person might come back out with a gun." Docket 34 at 3. The report and recommendation accurately describes Rothschadl's testimony. *See* Tr. 18:14-19. The report and recommendation did not find that the justification given was sufficient, by itself, to support a warrantless entry into the residence. Because the report and recommendation accurately describes the evidence in the record, Objection 3 is overruled.

### D.    Objection 4

Duenas-Ortiz objects to the report and recommendation's finding that Rothschadl knew that Duenas-Ortiz was the person pictured in the BOLO. Docket 34 at 3, 10 n.11 (finding in the report and recommendation); Docket 41 at 7-8 (objection). The report and recommendation states: "When asked if he immediately knew Duenas was the person in the BOLO, Rothschadl said, 'well, looking at the picture, I knew it was him, but I'm going to clarify it before I take somebody into custody.' " Docket 34 at 3. This section of the report and recommendation accurately states Rothschadl's testimony. *See* Tr. 24:10-13.

Duenas-Ortiz cites numerous statements from the deputies which he claims demonstrate that the deputies initially were not sure whether Duenas-

Ortiz was the person pictured in the BOLO. *See* Docket 41 at 8 ("All of this testimony revealed substantial doubt about their knowledge of Duenas-Ortiz's identity prior to admission."). Although both deputies stop short of asserting that they were completely certain that the man they observed through the window was the man pictured in the BOLO, their testimony does not reflect "substantial doubt" about that fact. *See* Tr. 9:23 (stating "the picture looked just like him"); Tr. 24:12-13 (stating "I knew it was him, but I'm going to clarify it before I take somebody into custody"); Tr. 25:19-21 (stating that when Duenas-Ortiz opened the door, Rothschadl recognized him as the person in the BOLO); Tr. 29:6-19 (stating that although the deputies could not be sure that Duenas-Ortiz was the person in the BOLO, he looked "very, very similar" and they were "fairly sure" it was him). Rather, the testimony indicates that when Duenas-Ortiz answered the door, at the latest, the officers were substantially certain he was the man pictured in the BOLO. Accordingly, Objection 4 is overruled.

### E.    Objection 5

Duenas-Ortiz objects to the report and recommendation's omission of the fact that Rothschadl knew questions about Duenas-Ortiz's identity would likely result in incriminating evidence. Docket 41 at 8. Rothschadl admitted that, given the nature of the offense, he knew that if Duenas-Ortiz acknowledged his identity, it would be substantive evidence of the crime which Rothschadl suspected Duenas-Ortiz was committing. Tr. 25:2-4. Objection 5 is sustained.

## II.      Fourth Amendment

### A.      Knock-and-Talk and Entry Into the Residence

The report and recommendation found that the "knock-and-talk"
procedure, in which the deputies approached the residence, knocked on the
door, and began a conversation with Duenas-Ortiz, was constitutional. Docket
34 at 6-8. Duenas-Ortiz does not object to that specific finding. *See* Docket 41
at 9 ("Duenas-Ortiz acknowledges that the deputies could lawfully knock on his
door without a warrant."). Knock-and-talks do not require a warrant "precisely
because that is no more than any private citizen may do." *Florida v. Jardines*,
133 S. Ct. 1409, 1416 (2013) (citations omitted).

The finding that the knock-and-talk did not violate Duenas-Ortiz's
constitutional rights, however, does not justify a subsequent warrantless entry
into a home—which entry is the heart of Duenas-Ortiz's argument. Docket 41
at 9; *see, e.g., Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011) (recognizing a
difference between consenting to answer police questions in a knock-and-talk
and consenting to an entry into a home). "[P]olice may not invade a person's
house without a warrant except under very limited circumstances, such as the
presence of exigent circumstances or an occupant's consent." *United States v.
McMullin*, 576 F.3d 810, 814 (8th Cir. 2009). It is undisputed that the deputies
did not have a warrant. The government has not shown the existence of any
exigent circumstances. The report and recommendation did not address the
issue of whether Duenas-Ortiz consented to the deputies' entry into the
residence.

"The government bears the burden to prove by a preponderance of the evidence that consent to search was freely given." *United States v. Aguilar*, 743 F.3d 1144, 1147 (8th Cir. 2014) (quoting *United States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009)); *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper*, 391 U.S. at 548-49. "[C]onsent 'can be inferred from words, gestures, or other conduct.' " *United States v. Rogers*, 661 F.3d 991, 995 (8th Cir. 2011) (quoting *United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009)). " 'Whether an individual's consent is voluntary is a question of fact that must be determined from the totality of the circumstances . . . .' " *Aguilar*, 743 F.3d at 1147 (quoting *Arciniega*, 569 F.3d at 398). In determining whether consent is voluntary, courts look to "the totality of the circumstances, including both the characteristics of the accused and the details of the interrogation." *United States v. Kelley*, 594 F.3d 1010, 1013 (8th Cir. 2010) (internal quotations omitted). " '[W]hether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual.' " *Id.* (quoting *United States v. Garcia*, 197 F.3d 1223, 1227 (8th Cir. 1999)).

Rothschadl testified that when he knocked on the door to the residence, Duenas-Ortiz freely answered the door. Tr. 8:12-13. Rothschadl stated that he immediately identified himself as law enforcement. Tr. 8:16-18. When Rothschadl asked to see Duenas-Ortiz's identification, Duenas-Ortiz immediately complied and went back into the house, leaving the door open

behind him. Tr. 9:5-17. Although Duenas-Ortiz did not give explicit permission for the deputies to follow him into the residence, he did not object when he turned around and they were inside. Tr. 9:17 (indicating that Duenas-Ortiz did not say anything about coming in or leaving); Tr. 21:25 (stating the Duenas-Ortiz saw the deputies enter behind him); Tr. 30:6-11 (testifying that Duenas-Ortiz never told the deputies to leave). Both Rothschadl and Klimisch testified that the interactions with Duenas-Ortiz were civil and polite. Tr. 15:13-14; Tr. 35:11-13. Klimisch also testified that it was likely fairly cold that day because the incident occurred in mid-December. Tr. 39:22-25.

Duenas-Ortiz contends that Rothschadl commanded Duenas-Ortiz to produce identification and then barged in behind him, making it unlikely that any consent, if given, was voluntary. Docket 41 at 11-12. Duenas-Ortiz also attempts to distinguish the holding in *Rogers* that allowing officers to follow a defendant into a residence amounted to implied consent based on the facts that in *Rogers*, the suspect agreed to show the officer a rifle and walked with the officer back to and into the apartment in question. *See Rogers*, 661 F.3d at 992-93. Duenas-Ortiz contends that because he did not explicitly agree to show the officers his identification and he did not demonstrate his intent to allow law enforcement into his home by walking back with an officer, the government cannot prove he consented to the entry. Docket 41 at 12.

Although some of the factors indicating consent in *Rogers* are not present in this case, there are other circumstances which show that an officer could reasonably assume that Duenas-Ortiz voluntarily consented to an entry of the

residence. Duenas-Ortiz freely answered the door to the residence. Upon Rothschadl's request to see identification, Duenas-Ortiz immediately turned to comply with the request. Significantly, Duenas-Ortiz left the door open behind him, which has been interpreted as a signal that officers may follow through the open door. *See United States v. Lakoskey*, 462 F.3d 965, 974 (8th Cir. 2006) ("[T]here is no indication in the record that [the defendant] invited [the officer's] entry, came outside to tell [the officer] to follow him, *left his door open*, or motioned for [the officer] to come in, implying that [the officer] should follow him.") (emphasis added). Duenas-Ortiz made the decision to comply with Rothschadl's request and to leave the door open before the deputies entered the residence behind him. Duenas-Ortiz never objected to the presence of the deputies. Although his preferred language is Spanish, both deputies indicated that Duenas-Ortiz seemed to understand what was happening and had no difficulty conversing with them. There are no circumstances indicating that Duenas-Ortiz did not want the officers to enter the residence. Given those facts, it would be reasonable for an officer in Rothschadl's position to assume that Duenas-Ortiz, who had been cooperative and polite at the beginning of the encounter, impliedly and voluntarily consented to an entry into the residence rather than requiring the officers to wait outside in the December cold for Duenas-Ortiz to retrieve his identification.[7]

---

[7] Because the court has determined that the government met its burden to demonstrate that Duenas-Ortiz consented to the initial entry, the court need not decide whether the deputies' testimony that they entered the residence to ensure officer safety was an exigent circumstance or merely a generalized

**B.     Search of the Mail, Cabinets, and Residence**

Duenas-Ortiz contends that the deputies violated his Fourth Amendment rights when they searched the mail, the kitchen cabinets, and the rest of the residence without a warrant. The report and recommendation found that these actions amounted to a Fourth Amendment violation but recommended that the motion to suppress be denied as moot because no evidence was discovered during those searches. Docket 34 at 13-15.

Even if Duenas-Ortiz consented to the initial entry into the residence, that consent would not give the deputies permission to search the residence. *See United States v. Castellanos*, 518 F.3d 965, 970 (8th Cir. 2008) ("When a person permits an officer to enter the person's home, the officer does not have free reign [sic] to wander around the home and search any area of the house, without further consent."). When the deputies rifled through the mail on the counter and opened and searched the kitchen cabinets, they did not have a warrant or consent to do so.[8] Additionally, a protective sweep of a residence is only justified either as a search incident to arrest or when circumstances present a concern for officer safety. *See Aguilar*, 743 F.3d at 1147. Under these circumstances, the searches of the mail and cabinets and the protective sweep were done in violation of the Fourth Amendment.

_____
notion of officer safety that would not amount to exigent circumstances.

[8] The deputies' testimony indicates some of the mail may have been in plain view, both on the kitchen counter and through glass on the kitchen cabinets. Because the government does not raise this argument, and because no evidence against this defendant was discovered during the search of the mail and kitchen, the court does not need to resolve whether the plain view doctrine would apply to these circumstances.

- 14 -

It is unclear whether Duenas-Ortiz would have standing to seek suppression of evidence based on the searches of the mail, cabinets, and residence. *See, e.g., United States v. Padilla*, 508 U.S. 77, 81 (1993) ("It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure.") (emphasis in original). Even if he had standing, it is undisputed that no evidence was directly discovered in those searches. "A constitutional violation does not call for suppression of physical evidence or statements when the violation does not cause the discovery of evidence or the utterance of the statements." *United States v. Spotted Elk*, 548 F.3d 641, 655-56 (8th Cir. 2008).

### C.    Statements Relating to Identity

Duenas-Ortiz contends that the statements he made, and other evidence of his identity, was related to Fourth Amendment violations and should be suppressed as the fruit of those violations. "The exclusionary rule applies to both direct and indirect fruits of the constitutional violation, including verbal statements." *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). To support exclusion of evidence, there must be a sufficient causal nexus between the evidence and the constitutional violation. *See United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007). "When the issue is whether challenged evidence is the fruit of a Fourth Amendment violation, the defendant bears the initial burden of establishing the factual nexus between the constitutional violation

and the challenged evidence." *Id.* (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)).

Rothschadl and Klimisch suspected that Duenas-Ortiz was the man pictured in the BOLO before they made contact with him. After Duenas-Ortiz opened the door to the trailer, Rothschadl testified that he recognized Duenas-Ortiz as the suspect in the BOLO. Before the deputies searched the residence, mail, or cabinets, Duenas-Ortiz provided an expired Mexican identification card that did not belong to him. Because the illegal searches of the residence, mail, and cabinets were not a cause of the challenged statements, the Fourth Amendment violations committed by the deputies do not require suppression.[9]

### D.    Warrantless Arrest

The report and recommendation found that the deputies did not violate Duenas-Ortiz's Fourth Amendment rights when they arrested[10] him without a warrant. Docket 34 at 10-13. Duenas-Ortiz does not object to this conclusion. " 'Probable cause to make a warrantless arrest exists when police officers have trustworthy information that would lead a prudent person to believe that the suspect has committed a crime.' " *United States v. Cardenas-Celestino*, 510 F.3d 830, 833 (8th Cir. 2008) (quoting *United States v. Sherrill*, 27 F.3d 344, 347 (8th Cir. 1994)). Duenas-Ortiz provides no argument or evidence

---

[9] Again, the court assumes without deciding that Duenas-Ortiz would have standing to assert a constitutional challenge based on a reasonable expectation of privacy in the papers and areas searched.

[10] Rothschadl stated that he did not arrest Duenas-Ortiz, but merely detained him so federal authorities could pick him up the next day. Tr. 21:10-15.

challenging the authority of the deputies, whether they had probable cause, or whether Duenas-Ortiz was likely to escape before an arrest warrant could be obtained. At the time Duenas-Ortiz answered the door and provided only an expired Mexican identification card, the deputies had probable cause to take him into custody because he matched the picture in the BOLO, was found at the residence described in the BOLO, and did not have any valid identification.

## III.   Fifth Amendment

Duenas-Ortiz also alleges that his Fifth Amendment rights were violated when he was questioned by Rothschadl. The report and recommendation found that Duenas-Ortiz was not in custody until Rothschadl called for another deputy to take Duenas-Ortiz into custody. Accordingly, the report and recommendation denied the motion to suppress the statements made before that point, but granted the motion to suppress any statements made after that point. Docket 34 at 8-10.

Even if officers did not violate Duenas-Ortiz's Fourth Amendment rights when they first entered the residence, the subsequent questioning by Rothschadl would violate Duenas-Ortiz's Fifth Amendment rights if the interview was custodial because Rothschadl did not advise Duenas-Ortiz of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A failure to provide *Miranda* warnings to an individual in custody leads to suppression of any statements made by the individual in custody. *Id.* Similarly, statements made by an individual may be suppressed even if made during a non-custodial

interview if the statements were not voluntary. *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976).

To determine whether an interrogation is custodial, courts "apply the six factor test set forth in *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990)." *United States v. Holleman*, 743 F.3d 1152, 1159 (8th Cir. 2014). Those factors are:

1. Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;

2. Whether the suspect possessed unrestrained freedom of movement during questioning;

3. Whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

4. Whether strong arm tactics or deceptive stratagems were employed during questioning;

5. Whether the atmosphere of the questioning was police dominated; and

6. Whether the suspect was placed under arrest at the termination of the questioning.

*Griffin*, 922 F.3d at 1349. Although these six factors are non-exhaustive, they are influential in examining the totality of the circumstances. *Id.* The Eighth Circuit has cautioned, though, that these factors should not be applied mechanically or ritualistically. *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004). "The ultimate question is whether a reasonable person would feel free to leave under the totality of the circumstances, that is, 'whether there

is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " *Holleman*, 743 F.3d at 1159 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

The deputies never informed Duenas-Ortiz that the questioning was voluntary, that he could leave, or that he was not under arrest. Tr. 23:11-24. Rothschadl testified that when he told Duenas-Ortiz to sit on the couch, he remained standing. Tr. 22:6-7. The residence was a trailer home and the living room where the couch was located was only a few feet from the front door. Tr. 22:2. Rothschadl positioned himself so he was between Duenas-Ortiz and the nearest exit to the residence. Tr. 22: 14-19.

The deputies immediately identified themselves as law enforcement and made no misrepresentations while talking to Duenas-Ortiz. Tr. 12:7-10. While the questioning was occurring, Klimisch was performing the protective sweep and searching the mail and kitchen cabinets. *See* Tr. 9:20-10:1 (stating that Klimisch was searching the mail while Rothschadl was questioning Duenas-Ortiz). Shortly thereafter, two other officers arrived, although it is unclear whether they ever entered the residence. Tr. 21:1-6. Immediately after the questioning, Duenas-Ortiz was taken into custody. Tr. 21:14-15.

Duenas-Ortiz did not initiate the contact with officers, and he was never told that the questioning was voluntary or that he could refuse to cooperate. Because the questioning occurred in a small space and Duenas-Ortiz was seated while Rothschadl stood over him and between him and the nearest exit, Duenas-Ortiz did not possess unrestricted freedom of movement during the

questioning. Two officers, both armed, were present the whole time, and two more arrived at different points. While Rothschadl was questioning Duenas-Ortiz, Klimisch was searching the residence, which would be an intimidating display of authority and control. Duenas-Ortiz was taken into custody within minutes after the encounter began. On balance, a reasonable person in Duenas-Ortiz's position would not have felt free to leave, and the totality of the circumstances demonstrates a restraint on movement of a degree comparable to a formal arrest. Therefore, the facts here weigh in favor of a finding that Duenas-Ortiz was in custody when Rothschadl questioned him.

In its brief to the magistrate judge, the government contended that even if Duenas-Ortiz was in custody when he made statements about his identity without being *Mirandized*, those statements were routine biographical information necessary to complete booking, and therefore were outside the scope of *Miranda*. *See* Docket 27 at 7-9. The report and recommendation concluded that Duenas-Ortiz was not in custody, so it did not reach this issue. *See* Docket 34 at 9-10.

Generally, routine booking questions are not considered interrogation. *See United States v. Lockett*, 393 F.3d 834, 837 (8th Cir. 2005). This processing exception to *Miranda,* however, does not extend to questions that are reasonably likely to elicit an incriminating response. *See United States v. Reyes*, 908 F.2d 281, 287-88 (8th Cir. 1990). The Supreme Court stated that "[a]nswering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances." *Hiibel*

*v. Sixth Judicial District*, 542 U.S. 177, 191 (2004). "Only if the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, will the questioning be subject to scrutiny." *United States v. McLaughlin*, 777 F.2d 388, 391-92 (8th Cir. 1985).

In this case, Rothschadl admitted he knew that Duenas-Ortiz's identity was an element of the substantive offense which Duenas-Ortiz was suspected of committing, and asking identity-related questions was likely to elicit an incriminating response. Tr. 25:2-4. The court finds that the questioning violated Duenas-Ortiz's Fifth Amendment rights because the questioning of Duenas-Ortiz was custodial, his answers were incriminating, and he had not been advised of his *Miranda* rights. Accordingly, the court grants Duenas-Ortiz's motion to suppress the statements made by Duenas-Ortiz during the interview in the residence.

## IV.   Fingerprints

Duenas-Ortiz argues that his fingerprints must be suppressed as fruit of constitutional violations. For support, Duenas-Ortiz cites *United States v. Guevara-Martinez*, 262 F.3d 751 (8th Cir. 2001). In *Guevara-Martinez*, the Eighth Circuit suppressed fingerprint evidence that was obtained by exploiting an unlawful detention and without consent. *Id.* at 755-56. The report and recommendation found that, even if Duenas-Ortiz was in custody when he admitted his true identity, there was no illegal detention and therefore no reason to suppress the fingerprints. Docket 34 at 10 n.11.

- 21 -

In this case, Duenas-Ortiz has not challenged the lawfulness of his detention. As the court noted when discussing the Fourth Amendment issues present in this case, the deputies had probable cause to arrest Duenas-Ortiz before the illegal searches or interrogation took place. *Guevara-Martinez* was premised upon a situation in which a suspect was unlawfully arrested and fingerprinted, which is not the case here. Duenas-Ortiz makes no showing that the fingerprinting was not part of the normal procedure followed when a person is detained on suspicion of an immigration offense. Because Duenas-Ortiz was not detained illegally, and because the fingerprints are not causally connected to any constitutional violations, Duenas-Ortiz's motion to suppress the fingerprint evidence is denied.

## CONCLUSION

Deputies Rothschadl and Klimisch did not violate Duenas-Ortiz's Fourth Amendment rights when they approached the residence and knocked on the door. They also did not violate the Fourth Amendment when they entered the residence with Duenas-Ortiz's consent or when they detained him. The unlawful searches of the residence, mail, and cabinets did not lead to any evidence and therefore do not require suppression. Because Rothschadl's questioning of Duenas-Ortiz took place under circumstances in which a reasonable person would not have felt free to leave, and because Duenas-Ortiz was not informed of his *Miranda* rights, any statements made by Duenas-Ortiz during the interview must be suppressed. But because Duenas-Ortiz was lawfully detained, his fingerprints are admissible. Accordingly, the report and

recommendation is adopted in part and rejected in part, and the motion to suppress is granted in part and denied in part consistent with this opinion.

Dated October 16, 2014.

BY THE COURT:

*/s/Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE